JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANDREW BUZIN, and BRIAN SIGMAN,
individually and on behalf
of a Class and SubClass

      Plaintiffs,

v.

FANDUEL, INC.,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**14 CV 9517**

CASE NO.

CLASS ACTION COMPLAINT,

JURY TRIAL DEMANDED

RECEIVED

DEC 02 2014

U.S.D.C. S.D.N.Y.

## <u>CLASS ACTION COMPLAINT</u>

     Plaintiffs ANDREW BUZIN and BRIAN SIGMAN ("Plaintiffs"), individually and on behalf of all other similarly situated customers of FanDuel, Inc. (the "Class"), bring [hereby file] this complaint against FanDuel, Inc. ("FanDuel", and/or "Defendant") and allege as follows:

     1.     Plaintiffs bring this class action to secure injunctive relief and monetary relief for the Class against Defendant for false and misleading advertising in violation of New York General Business Law §§ 349 and 350, as well as for monetary damages based on breach of contract.

     2.     FanDuel is a fantasy sports website that permits individuals to play one-day fantasy sports games ("Product(s)"). To begin playing on FanDuel, an individual is required to place a deposit and create a FanDuel account. That person can then use the money on deposit to pay entry fees to partake in daily fantasy sports games. At the end of the sports day, the winner of each fantasy contest is then awarded prize money which is inserted into their FanDuel account. FanDuel takes a certain percentage of each overall pot for each fantasy sports game as a fee for hosting the fantasy game. Since FanDuel fancies its fantasy sports games as a game of

skill, it is not gambling.  FanDuel is also in intense competition with several competitors to create market share for its games and aggressively markets on NFL games, sports television, sports radio and sports websites.

3.     As part of its promotion, FanDuel has continuously advertised that when you set up an account on the FanDuel website and make an initial deposit, FanDuel will match "dollar for dollar" that initial deposit up to $200 for all new members without any limitations, or that, without limitations, FanDuel will match a specific dollar amount based on the amount of the initial deposit.  Specifically, television commercials for Fanduel.com have advertised the following:

      a.     "Deposit now, and we'll match up to 200 bucks, dollar for dollar";

      b.     "double your deposit with promo code"; and

      c.     "deposit is 100% matched"

4.     There are additional FanDuel television and radio advertisements that use different language to promote the same promise of a "dollar for dollar" match including representing that the match is for "free".  Similarly, there are other advertisements where FanDuel asserts it will match a certain dollar amount for a specific initial deposit.  For instance, if a person puts down an initial deposit of $100, that person would receive $60 match as a "Welcome Bonus" or a $150 match for a $200 deposit.  However, this is totally untrue.  Indeed, the Defendant falsely represents and does not adequately disclose and omits that the "Welcome Bonus", which is free, is not a "dollar for dollar" match, or a match of a specific dollar amount, but is based on a very intricate formula that requires continued play on the FanDuel site and, in

some cases, an investment of over 2500% the initial deposit. Specifically, the formula used by FanDuel does not match a single dollar. The "Welcome Bonus" is released as 4% of the entry fee of each contest entered by that customer. Accordingly, the customer does not receive a single dollar for making an initial deposit. Instead, the customer must spend his deposit money in order to receive a bonus, and upon spending his deposit money, receives only 4% of that money as a bonus.

5.      For example, if a customer signs up and deposits $200 as his initial deposit, FanDuel does not match the customer's deposit with a bonus of $200, and the customer does not have $400 in his account. Instead, the customer is required to spend his deposit money by entering contests. If the customer enters a contest for $200, spending his entire deposit on a single contest, FanDuel distributes a bonus of $8 (4% of the contest entry fee). Based on this formula, the customer that made an initial deposit of $200 will have to spend $5,000 in contest entry fees in order to receive FanDuel's deposit matching bonus of $200. In other words, that customer must invest an additional $4,800 with FanDuel, before FanDuel releases its promised $200 matching bonus.

6.      So for Plaintiff, BUZIN, who put down, in November 2014, an initial deposit of $200 and was promised based on misleading advertising a match of $150, FanDuel did not match his initial deposit with $150, but rather only will release $8 of his "Welcome Bonus" upon playing the entire $200 initial deposit amount requiring him to spend $3,750 on FanDuel to receive his entire matching bonus.

7.      Likewise, for Plaintiff SIGMAN who, in December 2013 put down an initial deposit of $50 and expected FanDuel, based on FanDuel's misleading advertising, to match $50 deposit with $50.   SIGMAN has never received a "dollar for dollar match" from FanDuel. Rather, when SIGMAN spent the initial $50 deposit on contests, FanDuel released $2 of his promised bonus (4% of the contest entry fee).   In order for SIGMAN to have received his promised matching bonus of $50, he must spend a total of $1,250 in contests on FanDuel.

8.      Defendant's promotions violate New York General Business Code § 359 because under that statute deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service emanating from New York State is unlawful.

9.      In this same vein, Defendant's promotions violate New York Business Code § 350 which declares that false advertising in the conduct of any business, trade or commerce or in the furnishing of any service emanating from New York State is unlawful.

10.      Defendant's advertisements also become part of the contract between the Plaintiffs and the putative class and the Defendant, which the Defendant breaches by non-performance.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000.00) exclusive of interest and costs.   Additionally, at least one Class Member is a citizen of a state different than the Defendant.

12.     The Defendant at all relevant times herein conducted substantial business in this district and many of the violations occurred in this district, and many of the acts and transactions alleged in this Complaint occurred in this district.

13.     The Court has personal jurisdiction over the Defendant, who has its corporate headquarters in Manhattan, New York.

14.     Venue in the United States District Court for the Southern District of New York is proper because the Defendant resides in the District for purposes of venue and/or a substantial part of the events giving rise to the claims at issue in this Complaint occurred in this District.

## PARTIES

15.     At all times relevant hereto, Plaintiffs are New York citizens who seek to represent a nationwide class of persons who participated in FanDuel games and did not receive their promised "Welcome Bonus" match.  Plaintiffs purchased the Product over the internet while in New York.  In doing so, Plaintiffs relied upon the advertising and other promotional material which were prepared and approved by Defendant and their agents and disseminated from their New York principal place of business, through its national advertising media, containing the misrepresentations alleged herein which were designed to encourage consumers to purchase the Product.

16.     Defendant FanDuel is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located in Manhattan, New York.  FanDuel offers the Product for sale through its internet site throughout all fifty states, through business activities that emanate from New York.  FanDuel is the owner and operator of the FanDuel

*Buzin v. FanDuel, Inc.*
Class Action Complaint
Page **6** of **16**

Product and is the company that created and/or authorized the false, misleading, and deceptive

advertisements for the Product.

17.    In committing the wrongful acts alleged herein, Defendant planned and

participated in and furthered a common scheme by means of false, misleading, deceptive, and

fraudulent representations to induce members of the public to purchase the Product directly from

its New York place of business.  Defendant participated in the making of such representations in

that each did disseminate or cause to be disseminated said misrepresentations.

18.    Defendant, upon becoming involved with the creation, distribution, advertising,

marketing, and sale of the Product, knew or should have known that the representations about the

Product and, in particular, the "dollar for dollar" free match or a specific dollar match on initial

deposits for the Product were false.  Defendant affirmatively misrepresented the match, as set

forth herein, in order to convince the public to purchase and use the Product, resulting in profits

of millions of dollars or more to Defendant, all to the damage and detriment of the consuming

public.

19.    FanDuel ran its first radio advertisement in March 2011.  FanDuel ran its first

Television advertisement in August 2012 and has run internet advertisements since at least

March 2011.  The Plaintiffs are without knowledge as to when FanDuel first ran this misleading

advertisement campaign.   However, the misleading ad campaign has successfully directly

increased FanDuel's exposure and has directly increased the number of paying players.  For

example, in the past three (3) months (August, September and October 2014), FanDuel has

brought in 650,000 new paying players based upon this misleading advertising.  Moreover,

FanDuel anticipates that it will take in $550 million dollars in entry fees for its fantasy contests this season alone. *See* NBA Partners with FanDuel, *ESPN.com,* Nov. 19, 2014. A copy of the article is attached hereto an incorporated herein as Exhibit A.

## FACTS AND DEFENDANT'S COURSE OF CONDUCT

20.     FanDuel engages in marketing campaigns that suggest that its fantasy sports are the leader in one-day fantasy sports game play. They have put together a multi-million dollar advertising campaign focused on sports enthusiasts that play fantasy sports for fun with their friends and have induced these persons to participate on their website with the lure that winning fantasy sports on their website may result in million dollar payoffs. As part of this advertising scheme, FanDuel entices these fantasy enthusiasts with promotions which are meant to make individuals believe that their initial deposits, which are required in order to play on the FanDuel site, would be immediately matched and would permit double the amount of play on the site based on the single deposit up to $200, or a match for a specific dollar amount based on the size of the initial deposit, and that the match would be free of charge. So in other words, if a person deposited $10, that person would be immediately able to play well in excess of that initial deposit immediately.

21.     It is only after a person makes that initial deposit and tries to use the monies in their account, do they become aware that FanDuel does not immediately match deposits "dollar for dollar" or in a specific amount, but rather will only provide additional [match] monies in that player's account over time, and only after they continuously pay for additional games and either deposit additional monies and/or utilize monies that they won on the site. Moreover, the

individual is never told that the "dollar for dollar" match actually can be deleted from an account due to inactivity on the site.

22.     During the course of its false, misleading, and deceptive advertising campaign, Defendant has sold millions of dollars more of its Product based upon Defendant's false promises.  Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's false representations.

23.     When a person signs up for FanDuel, based on its false and misleading advertising of a free "dollar for dollar" match or a specific dollar match of the initial deposit, the user was required to use a specific promotion code ("Promotion Code") in order to obtain the free match.  There are many different promo codes that have been advertised to be used for this deposit bonus.  The Plaintiffs do not know all of the promotion codes utilized by the Defendant for this promotion but this information will be determined through discovery.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure Rule 23, on their own behalf and on behalf of all other persons similarly situated.    The Class which Plaintiffs seek to represent comprises:

> All persons who purchased FanDuel, using a Promotion Code.

The Plaintiffs also seek to certify the following SubClass:

> All persons who purchased FanDuel, while physically in
> New York State, using a Promotion Code.

Plaintiffs and the Class reserve the right to amend the Class and Subclass definition as discovery proceeds and to conform to the evidence.  Excluded from the Class and Subclass are: any

Defendant, and any subsidiary or affiliate of that Defendant, and the directors, officers and employees of that Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

25. **Numerosity Rule 23 (a)(1):** The Class and Subclass are comprised of several hundred thousand persons. The Class and Subclass are so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will benefit the parties and the Court.

26. The Class and Subclass are identifiable and readily ascertainable as each person was required to use Promotion Codes, and other identifying information, when signing up with FanDuel in order to obtain the "welcome bonus". Notice can be provided to such purchasers using techniques and a form of notice customarily used in class actions, such as by direct mail based on Defendant's business records, internet publication, radio, newspapers, and magazines.

27. **Commonality and Predominance (Rule 23(a)(2); Rule 23(b)(3))**. There are common questions of law and/or fact that predominate over any questions affecting only individual members of the Class and/or Subclass. These principal common issues include the following:

     a.  Whether Defendant's conduct is a violation of New York Business Code § 349;

     b.  Whether Defendant's conduct is a violation of New York Business Code § 350;

 c. Whether Defendant's violations of New York Business Code §§ 349 and 350 occurred within the State of New York;

 d. Are the Plaintiffs, the Class and Subclass entitled to monetary relief under New York law;

 e. Are the Plaintiffs, the Class and Subclass entitled to injunctive relief under New York law;

 f. Did the Defendant's conduct constitute a breach of contract entitling the Plaintiffs and the Class and Subclass to monetary relief under New York law.

28. **Typicality Rule 23 (a)(3):** The Plaintiffs' claims are typical of the claims that would be asserted by other members of the Class and Subclass in that, in proving its claims, Plaintiffs will simultaneously prove the claims of all Class and Subclass Members. Plaintiffs and each class member are people that purchased FanDuel using a certain Promotion Code that is tied to one of the misleading forms of advertising described herein, and Plaintiffs and each member of the Class and Subclass will seek declaratory relief, injunctive relief and breach of contract damages to determine its rights and entitlement to damages.

29. **Adequacy (Rule 23(a)(4)).** The Plaintiffs are Members of both the Class and Subclass and have no conflicts of interest and will fairly and adequately protect and represent the interests of each member of the Class. Additionally, the Plaintiffs are fully cognizant of their responsibility as Class Representatives and have retained experienced counsel fully capable of,

and intent upon, vigorously pursuing the action.  Indeed, class counsel has extensive experience in consumer class claims substantially similar to the claims posed in this litigation.

30.     **Rule 23(b)(2).** Under Count I, the Defendant acted or refused to act on grounds or in a manner generally applicable to all members of the Class and Subclass, thereby making declaratory relief to the entire Class and Subclass particularly appropriate.

31.     Because Plaintiffs seek declaratory relief for Class Members under Rule 23(b)(2), the prosecution of separate actions by individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and Subclass that would establish incompatible standards of conduct for the Defendant. Further, adjudications with respect to individual members of the Class and Subclass would, as a practical matter, be dispositive of the interests of other members of the Class and Subclass who are not parties to the adjudication and may impair and impede their ability to protect their interests.

32.     **Rule 23 (b)(3).** Under Count I, the Plaintiffs and the Class and Subclass seek a judgment finding that the Defendant has systematically breached the representation/promise by failing to match, "dollar for dollar," a member of the Class' (or Subclass') initial deposit or by failing to provide a specific dollar figure match based on the amount of the initial deposit, which will be based on objective data and will be easily ascertained through the Defendant's computer records based on standardized Promotion Codes.  Moreover, Defendant's class wide utilization of web based computer programs to control its entire business makes this claim particularly susceptible to class certification, as the court or finder of fact will easily be able to determine not

only the affected members of the Class and Subclass, but the amount of their initial deposit that was not correctly matched by the Defendant.

33.     Count II seeks payment of money damages based on the breach of contract. There will be no significant individual questions related to liability with respect to Count II because the Defendant's liability arises from the same pattern and practice of not matching person's initial deposit without paying additional amounts over the initial deposit. Indeed, these determinations will merely require a formulaic recalculation utilizing the Defendant's own computer software. Accordingly, the method for proving damages for each Class and Subclass Member will be identical, and as a corollary, common issues predominate and class treatment of Plaintiffs' claims is easily maintainable and superior to individual lawsuits.

34.     **Rule 23(c)(4).**  In the alternative, if the Court is not inclined to certify a monetary damage class it can certainly certify an issue class with respect to the Defendant's liability on a class-wide basis and then proceed in accordance with the Federal Rules of Civil Procedure and employ other mechanisms at its disposal with respect to damages of individual members of the Class.

**COUNT I**
**NEW YORK  BUSINESS CODE § 349 and § 350---CLASS ALLEGATIONS FOR DAMAGES BASED ON DEFENDANT'S DECEPTIVE ACTS AND PRACTICES**

35.     Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

*Buzin v. FanDuel, Inc.*
Class Action Complaint
Page **13** of **16**

36.     The Defendant's actions described in this complaint were always directed to consumers in order to entice them to sign up for FanDuel and indeed, the Plaintiffs and the Class are consumers.

37.     The Defendant, as described herein has engaged in advertising, that was deceptive or misleading in that it objectively mislead an average consumer like the Plaintiffs, Class and/or Subclass Member that the person would receive their entire "Welcome Bonus" upon signing up and expending their initial deposit on the FanDuel website instead of having to either deposit as much as 2500% of the initial deposit and/or utilize 2500% of monies that they won on the site in order to obtain the entire "Welcome Bonus". This advertising was material with respect to the decision to purchase or engage in FanDuel because in order to receive the Welcome Bonus, a special Promotion Code, which was disclosed through access to the misleading advertising, must be used.

38.     The Plaintiffs in fact, saw one of the Defendant's misleading advertisements and signed up for FanDuel based, in part, on the "Welcome Bonus" promotion and utilized a Promotion Code when they in fact signed up.

39.     Plaintiffs and the Class have been aggrieved by Defendant's unfair and deceptive practices in that they placed an initial deposit with FanDuel and have not been provided a "dollar for dollar" match of that deposit or a specific dollar amount based on the amount of the initial deposit without continued use and financial commitment to FanDuel.

40.     The actual damages suffered by Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as more fully described herein.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendant as follows:

a.   Certifying the Class or Subclass pursuant to Rule 23 (b)(2) and (b)(3) *Fed. R. Civ. P.*, and appointing Plaintiffs as representatives for said Class Members and Plaintiffs' counsel as Class Counsel;

b.   Awarding actual damages or fifty dollars whichever is greater;

c.   Exercise its discretion and increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars because the Defendant's actions were willful and knowing violation of §§ 349 and 350;

d.   Awarding pre-and post-judgment interest, as allowed by law;

e.   Enjoin further advertising as described herein;

f.   Requiring the Defendant to provide the dollar for dollar match without any additional play;

g.   Awarding reasonable attorney's fees and costs to Class Counsel; and

h.   Granting such other and further relief as is just and proper.

## <u>COUNT II</u>
## <u>CLASS ALLEGATIONS FOR BREACH OF CONTRACT</u>

41.     Plaintiffs hereby incorporate by reference paragraphs 1-34 as more fully set forth therein.

42.   The Defendant made an offer to the Plaintiffs, the Class and Subclass which included, amongst other things, an immediate "dollar for dollar" match of a person's initial deposit or a specific dollar match based upon the amount of the initial deposit.

43.   The Plaintiffs, the Class and Subclass accepted the Defendant's offer by signing up on the FanDuel website and utilized a Promotion Code which was required for the "dollar for dollar" or specific dollar match.

44.   The Defendant breached its contract with the Plaintiffs, the Class and the Subclass by not providing a "dollar for dollar" or specific dollar match of the initial deposit, but rather required extensive additional deposits or outlaying of monies in order to obtain the match.

45.   The Defendant's conduct has caused the Plaintiffs, the Class and Subclass damages giving rise to the claims herein.

46.   Moreover, the Defendant's formula for its calculation of the "Welcome Bonus" was not clear or conspicuous to users like the Plaintiffs, the Class and Subclass at any time, but, at all times material is unclear and hidden by the Defendant and is thereby a violation of the implied duty of good faith and fair dealing. Moreover, the Defendant's formula which requires additional payment of as much as 2500% of the initial deposit in order to obtain the full "Welcome Bonus", which is advertised as a "dollar for dollar" or specific dollar match, is unconscionable and a further breach of the implied covenant of good faith and fair dealing.

WHEREFORE, the Plaintiffs, individually and on behalf of the Class and Subclass request that a judgment be entered against the Defendant for their damages, costs, interest and any other relief this Court deems just and reasonable.

*Buzin v. FanDuel, Inc.*
Class Action Complaint
Page **16** of **16**

### Jury Trial Demand

The Plaintiffs, individually and on behalf of the Class and Subclass hereby demand a trial

by jury of all issues that can be tried by a jury.

DATED: New York, New York
December 2, 2014

**Fisher, Byrialsen& Kreizer PLLC**

**By:**  _____

David P. Kreizer (NY Bar #DK-3534)
Kreizer@FBKLegal.com
*Counsel for the Class Plaintiffs*
291 Broadway Suite 709
New York, New York 10007
(212) 962-0848

Exhibit A

11/19/2014                                    ESPN.com - NBA partners with FanDuel

 **ESPN.com:** NBA                    [Print without images]          

Wednesday, November 12, 2014

# NBA partners with FanDuel

By Darren Rovell
ESPN.com

The NBA has signed a four-year exclusive daily fantasy deal with FanDuel, the league announced Wednesday.

Financial details were not disclosed, but as part of the deal, the league will become an investor in the market leader in one of the fastest-growing sports sectors. FanDuel also will be the only daily fantasy site featured on the league's official website.

"The special status helps legitimize us, but we wanted to do this deal because the NBA, more than any other league, they understood the upside to them as well," FanDuel CEO and co-founder Nigel Eccles said.

Eccles noted that the company's data shows that once a fan starts playing daily fantasy, his or her weekly sports TV consumption jumps from 17½ hours to 24 hours.

"It's clear that many of our fans are in the two-screen world, watching the game and having another device open to do something else," said Sal LaRocca, president of the NBA's global operations and merchandising. "Daily Fantasy is now part of that experience."

The relationship does not enable FanDuel to be the exclusive provider of NBA daily fantasy, as any service is legally allowed to offer an NBA fantasy game. In 1996, statistics company Stats Inc. won a case against the NBA, which established that players' names when tied to statistics were not subject to copyright protection.

FanDuel's deal with the NBA comes days after the NHL announced an exclusive partnership with its competitor DraftKings.

The market for daily fantasy has been growing exponentially in the past couple of years.

"We used to have a guy who kept a spreadsheet of all the daily fantasy sites," Eccles said. "We had to stop counting."

FanDuel has recently raised its projections on net revenue for 2014 to $60 million. That's up from just $14.5 million last year.

The company says it will take in more than $550 million in entry fees this season, giving 91 percent of that back to its customers in prize money.

FanDuel has brought in 650,000 new paying players in the past three months. Before this year, the company never had a single quarter with more than 200,000 active players.

Eccles said he's excited about basketball because it has been relatively untapped, as the season-long game has proved to be a grind for many.

"More than half of people who start playing daily fantasy basketball with us are playing fantasy basketball for the first time," Eccles said. "We hope we can convert half the fans who came to our site to play daily fantasy football and get them to like playing daily fantasy basketball."

FanDuel, which already had forged individual deals with the Brooklyn Nets, Chicago Bulls, Dallas Mavericks, New York Knicks and Orlando Magic, has taken in $88 million in venture capital funding from the likes of Bullpen Capital, Shamrock Capital and Comcast Ventures.

Daily fantasy is considered legal thanks to the Unlawful Internet Gambling Enforcement Act which, in 2006, clarified online gambling regulations. Participation in fantasy sports was exempted on the grounds that it was a game of skill.

Online fantasy sports still can't be played in five states -- Arizona, Iowa, Louisiana, Montana and Washington.